**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
|     **v.** | ) |
| | ) |
| | )  **No. 4:11-CR-238 RWS** |
| | ) |
| **STEPHEN E. VIERLING,** | ) |
| | ) |
|     **Defendant.** | ) |

**SENTENCING HEARING**
**BEFORE THE HONORABLE RODNEY W. SIPPEL**
**UNITED STATES DISTRICT JUDGE**
**OCTOBER 28, 2011**

APPEARANCES:

For Plaintiff:          Michael W. Reap, Esq.
                        OFFICE OF U.S. ATTORNEY
                        111 South Tenth Street, 20th Floor
                        St. Louis, MO  63102


For Defendant:          Sanford J. Boxerman, Esq.
                        David Capes, Esq.
                        CAPES AND SOKOL
                        7701 Forsyth Blvd., 12th Floor
                        Clayton, MO  63105


For Movant:             David W. Harlan, Esq.
                        Armstrong Teasdale, LLP
                        7700 Forsyth Blvd., Suite 1800
                        Clayton, MO  63105


REPORTED BY:            SHANNON L. WHITE, RMR, CRR, CSR, CCR
                        Official Court Reporter
                        United States District Court
                        111 South Tenth Street, Third Floor
                        St. Louis, MO  63102
                        (314) 244-7966

    PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

1        (PROCEEDINGS STARTED AT 11:05 AM.)

2    (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT AND WITH

3                  THE DEFENDANT PRESENT:)

4        THE COURT:  Morning.  We are here today in the case

5    styled United States of America against Stephen Vierling,

6    Cause No. 4:11-CR-238.  Would counsel make their appearances,

7    please?

8        MR. REAP:  Michael Reap for the United States.

9        MR. BOXERMAN:  Sanford Boxerman for Mr. Vierling, and

10   here with me is David Capes, who's also been representing Mr.

11   Vierling in this matter.

12       THE COURT:  And Mr. Vierling is present; is that

13   correct?

14       MR. BOXERMAN:  Yes, sir.

15       THE COURT:  Counsel, have you and Mr. Vierling had

16   the opportunity to read, review, and discuss the presentence

17   report in this matter?

18       MR. BOXERMAN:  We have, Your Honor.

19       THE COURT:  On behalf of Mr. Vierling, are there any

20   objections to the factual statements in the presentence

21   report?

22       MR. BOXERMAN:  There is -- well, there are objections

23   that we filed, and I have no additional objections beyond

24   what's been filed.  We do object to one of the components of

25   restitution that's been suggested in the report by the

3

1    probation officer.

2          And I think we have some other objections that may or

3    may not need to be ruled upon or may be ruled upon just in the

4    course of the Court rendering its judgment, but that's our

5    primary objection today.

6          THE COURT:  All right.  Well, let's go through your

7    objections, starting with paragraph 14 and 15.  I mean, rarely

8    do you object to everything in a paragraph, so tell me what

9    specific factual allegations in paragraph 14 are objected to.

10         MR. BOXERMAN:  Well, to the extent paragraph 14 reads

11   as though Mr. Vierling came forward and from the beginning

12   said that the amount he embezzled was $400,000, we object to

13   that.  There was some discussion about what the $400,000

14   figure represented, but it was not the scope of the

15   embezzlement.

16         I don't know that the Court necessarily has to rule

17   on this objection, but it's something we wanted to bring to

18   the Court's attention because we didn't want it to go

19   unremarked upon to the extent that paragraph 14 read that way.

20         THE COURT:  So you would object to the penultimate

21   sentence in paragraph 14; is that right?  It's the only place

22   I see a reference to his representation as to an estimation as

23   to the amount.

24         MR. BOXERMAN:  Yes.  But you know, the final sentence

25   of the paragraph sort of clears that up.

4

1          MR. REAP:  It does.

2          MR. BOXERMAN:  So I think -- you know, I did these

3    objections when we only had the --

4          THE COURT:  When you had the preliminary disclosure.

5          MR. BOXERMAN:  Right.  So now that I look at that

6    last sentence, I think that Ms. Kintz did what I asked her to

7    do, which is clarify that for us.

8          THE COURT:  Do you think that's a fair and accurate

9    representation of the --

10          MR. BOXERMAN:  Yes, yes.

11          THE COURT:  All right.  All right.  So the objection

12    to paragraph 14 has been satisfied by the amendment by the

13    probation office in the final version.

14          MR. BOXERMAN:  Yes.

15          THE COURT:  All right.  So that objection is now

16    moot.  As to paragraph 15?

17          MR. BOXERMAN:  I would say the same thing, that it's

18    now been handled appropriately, so it's been mooted by the

19    revision of the presentence report from the disclosure copy to

20    the final copy.

21          THE COURT:  Only.  Let's go to paragraph 68.

22          MR. BOXERMAN:  The objection there is to the last

23    sentence, but it's not a factual objection.  We don't object

24    to the factual material that the probation officer has put in

25    her report.  It's a matter that the Court will have to decide.

5

1          THE COURT:  That's an opinion.  It's not a fact.

2          MR. BOXERMAN:  Correct.

3          THE COURT:  Or recommendation, if you will, by

4    probation, essentially to me but subject to argument by

5    counsel and the parties.  Paragraph 80?

6          MR. BOXERMAN:  That's the one that I was referring to

7    above.  We do object that the restitution figure should not

8    include these $200,000 forensic accounting fees.

9          THE COURT:  So that would be the last full sentence

10   of paragraph 80; is that right?  And then the amount that's

11   included in the loss amount to City Lighting Products.

12         MR. BOXERMAN:  That's correct, Your Honor.

13         THE COURT:  Okay.  And that amount is $200,055.20.

14         MR. BOXERMAN:  That is correct.

15         THE COURT:  Mr. Reap, I turn to you to put on any

16   evidence you wish as to that.

17         MR. REAP:  Judge, I'm not going to put any evidence

18   on.  I think I have responded to this issue in documents that

19   we have filed under seal because the victim has filed

20   pleadings under seal, and we've responded appropriately.  Mr.

21   Boxerman and his client have seen all of those pleadings and

22   our responses.

23         And frankly, as to the forensic accounting costs, not

24   the direct embezzlement, we think there were multiple purposes

25   of doing that, and frankly, that work was really done, not

1    that they didn't have the right to do it themselves

2    independently, but it was done first of all by the defendant

3    internally with his lawyers and employees that had accounting

4    background, and then when we got involved, the Government, in

5    August of 2007, we went over those figures.

6          So as far as the actual embezzlement, we very early

7    in this investigation had a pretty good idea of what we were

8    dealing with, and we don't necessarily think that those

9    restitution, the accounting figures, should be applied as

10   mandatory restitution.

11         THE COURT:  Mr. Boxerman?

12         MR. BOXERMAN:  Well, if the Government's -- I mean,

13   my view of this, we've made our objection.  If the Government

14   is not presenting evidence on the point, then the objection

15   should be sustained and that part of it should come out of the

16   restitution calculation.

17         MR. REAP:  Now, I would also like to, at least for

18   the record, suggest that all pleadings, including victim

19   information on this issue, went to the probation office; so in

20   other words, they've got all of the supporting data for all of

21   these figures and how we came to the conclusion that as far as

22   the direct embezzlement, (A), it should be the two hundred and

23   ninety-two thousand and some change, and the analysis of the

24   forensic accounting costs they have presented added to the

25   probation office.  So I don't know what else -- as far as

1    actual testimony, we're not going to put anything on.

2            THE COURT:  Okay.  Mr. Harlan, it's a little unusual,

3    but I mean, the United States Attorney is in charge of its

4    prosecution, but obviously you wish to be heard at this

5    moment.

6            MR. HARLAN:  I would like to be heard on this

7    specific point, Your Honor.  We submitted papers to the court,

8    an affidavit of Donna Beck Smith of Brown Smith Law.  She was

9    the forensic accountant in charge of the audit.  Her

10   declaration indicated that the $200,000, which was spent only

11   to conduct a forensic audit to identify amounts embezzled by

12   Mr. Vierling, her declaration had bills attached to it.  There

13   was also a declaration from Mr. McCartney, the current CFO of

14   the company, indicating that that was the purpose of the

15   audit.

16           And the factual setting in which this occurred I

17   think is important to the Court, for the Court to understand.

18   Mr. Vierling quit on short notice on October 4, 2007, the day

19   that the company's offices were raided.  The company was left

20   without a chief financial officer.  They began to try and

21   understand what had occurred, and they found company records

22   were missing.  These were records that turns out that had a

23   direct bearing on the embezzlement.  The company had tax

24   returns, financial statements to prepare for its banks, and it

25   had to figure out the exact position it was in.

1          The Government during this period was aware that

2     there had been an embezzlement, but they didn't communicate

3     that information to City Lighting or its attorneys until

4     sometime after the audit was complete, and we think that this

5     situation is just like the situation in the DeRosier case

6     that's cited in our papers where this audit and cost of it was

7     a direct result of the embezzlement, so I'll . . .

8          THE COURT:  Any response other than what's previously

9     been --

10          MR. REAP:  Well, the raid occurred under

11     court-ordered search warrant out of this courthouse.  Well,

12     individuals of the company were told of the nature of the

13     investigation, both corporate and individual.  And I don't

14     want to be quoted on this, and maybe Mr. Harlan can help my

15     memory.  I think early on I know there was at least an early

16     meeting where the defense team brought to my attention what I

17     already knew:  That Mr. Vierling had embezzled some money.

18     And I told them I was aware of that, and but for whatever

19     reasons they did this audit.  I think I would suggest they

20     were multiple because they were clearly told the nature of the

21     investigation, which was twofold, and I said that in my sealed

22     pleadings in response to their sealed documents.

23          THE COURT:  How much of --

24          MR. REAP:  And frankly --

25          THE COURT:  -- this also touches on the kickback

1    convictions that while aren't the focus of what's here today,

2    but have arisen through the course of the investigation here?

3              MR. REAP:  Well --

4              THE COURT:  I mean, this isn't the only prosecution

5    that arose out of --

6              MR. REAP:  Right.  There were five -- let me count

7    and make sure -- one, two, three, four individuals from

8    customers who were prosecuted.  A fifth individual, one of the

9    sons, Timothy, was prosecuted for those matters.

10             And the other thing -- well, but they knew of the two

11   prongs of the investigation very early after the court-ordered

12   search warrant.

13             MR. HARLAN:  Your Honor, there were a number of

14   forensic investigations conducted.  The one that we're talking

15   about here related only and solely to identifying the amount

16   of the embezzlements, the method for the embezzlements so the

17   company could establish internal controls and prepare

18   financial statements.

19             I will tell you that the company spent a great deal

20   of money conducting forensic investigations relating to the

21   spurious tax allegations, but those are separate and apart.

22   They are not included in this $200,000.  And they had a

23   completely --

24             THE COURT:  What about the kickback investigations

25   that resulted in five convictions?

1          MR. HARLAN:  We did not -- we conducted

2    investigations of those, Your Honor, but not through the

3    forensic accounts.  They had nothing to do with those.

4          THE COURT:  I mean, if you do a forensic accounting

5    of the books of the company that's a victim, in part, or even

6    perhaps if everything I read is a participant actively in the

7    kickback investigations, how do you parse out the embezzlement

8    conduct from the kickback conduct?

9          MR. HARLAN:  I think factually --

10         THE COURT:  Oh, do you ignore this while you're

11   looking at the books of the company but only look at this?  I

12   mean, how do you do that?

13         MR. HARLAN:  I think that the two are factually

14   unrelated.

15         THE COURT:  But if you're looking at the books of the

16   company, how do you isolate that and say when you do an

17   analysis of the books and records of the company, you're

18   not -- you just ignore that part of it?

19         MR. HARLAN:  Well, I won't say that we ignored that

20   part of it, Your Honor, but that was not part of this

21   investigation.  This investigation was directed solely to

22   embezzlements.

23         MR. REAP:  If I may add one thing to this dialogue,

24   we certainly looked at the books and records of the company as

25   to how they posted these payments out of City Lighting to

1    certain customers, and frankly, we don't know -- we don't

2    believe they were accurately reported.  Now, that's kind of

3    part and parcel of this tax situation.

4            And bear in mind by pure coincidence there was a

5    civil -- random civil audit that was in play as Mr. Vierling

6    was coming to us.  That obviously was put on hold.  But the

7    City Lighting Company and the principals at the company knew

8    about that because that was mailed to them.  As to part of

9    their company in the undercover investigation, there's a

10   substantial dialogue on that issue.

11           But you know, finally, one other thing -- and I

12   suggest in my sealed documents -- that a victim's got a lot of

13   rights, arguably rights, we will attempt to do the best we can

14   on this issue as we always do, but they also have private

15   recourse on this issue.  They can -- obviously, they've hired

16   a lot of lawyers, both individual and corporate, spent a lot

17   of money on this --

18           THE COURT:  And, apparently, a forensic accountant?

19           MR. REAP:  And spent a lot of money for a lot of

20   reasons, and proper reasons probably, but they can sue Mr.

21   Vierling on this issue.  In that context, as I say in the

22   sealed documents, there is a 401(k) that Mr. Vierling has, and

23   Mr. Vierling's lawyers have formally by letters, and I have

24   informally in dialogue, said, What about the 401(k) going back

25   to Mr. Vierling?  That is still being held.  The only response

12

1  I have seen is there is some belief without any specificity

2  that there may be fraud involved in the 401(k).  I've never

3  seen that, but that all is again --

4          THE COURT:  That's not in front of me.

5          MR. REAP:  And relating to the civil.

6          THE COURT:  Right.

7          MR. REAP:  Potentially.

8          THE COURT:  The last thing we want to do is get into

9  ERISA today if we can help it, but I will.  I'm not afraid of

10  it, but, you know.

11          MR. REAP:  Well --

12          THE COURT:  But that's not what's in front of me

13  today, to be candid about that.  Anything further?

14          MR. BOXERMAN:  Just very briefly.  The issue here is

15  the objection to the presentence report.  The presentence

16  report made a recommendation and a factual statement.  We

17  objected.  So that fact, whatever is in the presentence

18  report, is not evidence.  The Eighth Circuit law is really

19  clear on that.

20          The Government is supposed to put forward evidence if

21  it wants to support the presentence report.  The Government

22  has told the Court it's not putting forth any evidence.

23          Mr. Harlan is suggesting that notwithstanding that,

24  there is this affidavit before the Court that maybe, I don't

25  know if you'd put it in these words, but he says, well, maybe

1    there's your evidence and you can sustain based on that.

2           The problem with that, very much related to what

3    Mr. Reap said and sort of the comments of the Court as well

4    is, notwithstanding the affidavit you can't tell how much of

5    the two hundred is to figure out the embezzlement and how much

6    is for other purposes.  And even though the affidavit says,

7    oh, it's all for figuring out the embezzlement, that's

8    demonstrably not the case.

9           And the reason I say that is, the BSW report that

10   calculates the amount of the embezzlement, and it's the same

11   amount that Mr. Harlan's client has been putting forth ever

12   since.  That report is dated October 15, 2008.  And yet of the

13   eight invoices that they are trying to seek recovery for, at

14   least four of those, if my count is any good, four or five are

15   after October 15.  They're after the date of the report.  And

16   that number hasn't changed.

17          So right then and there you can tell that not all of

18   that two hundred was for figuring out the amount of the

19   embezzlement.

20          As Mr. Reap says, there were other things going on.

21   There was the defense of the tax investigation.  There was a

22   meeting in December of 2008 at the U.S. Attorney's office

23   involving Mr. Reap and IRS, Mr. Harlan, and the accountants.

24   And the accountants at that meeting made a PowerPoint

25   presentation defending the tax allegations.  They didn't incur

1    all of these monies to figure out the embezzlement.  They

2    incurred it for other things.

3         And it's a failure of proof.  If the Court considers

4    this affidavit to even be in the record for this purpose,

5    which I'm not sure it is, it doesn't carry the burden of

6    establishing by a preponderance of the evidence what amount

7    was directly incurred as a result of the embezzlement.  And

8    for that reason, the objection that we have raised should be

9    sustained and we should go forward.

10        THE COURT:  Anything further?  I am concerned if

11   the -- because the invoices postdate that -- the time of the

12   determination of the amount of the embezzlement, and knowing

13   that there were other targets within the sphere of -- based

14   upon what's before the Court, as to how I'm supposed to parse

15   the cost of the accounting given all the tax investigation,

16   the other targets within and outside the company by the IRS

17   and the U.S. Attorney's office grand jury investigation.

18        Just as a practical matter, I'm kind of taken aback

19   that we identify $292,000 in embezzlement but we spent

20   $200,000 to do it.  That kind of slows you down a little bit,

21   you know, in terms of just reasonableness.

22        MR. REAP:  That's really why we in our plea agreement

23   said that the best efforts of the litigants -- Mr. Vierling,

24   the Government -- comes to the conclusion that the loss is,

25   for mandatory restitution purposes, the 292,000.  The law does

1    not demand that we come to a penny, within a penny, or to the

2    penny of actual.  It is that we do our best efforts.

3            Now, in that context, and this is again in the

4    documents, and I know Mr. Boxerman is going to talk about

5    this, there is substantial money that is going to flow to the

6    court through the clerk's office for mandatory restitution,

7    and that began on day one, August 2007, in the original

8    dialogue with Mr. Capes, Mr. Boxerman, Mr. Vierling, Mike

9    Reap, IRS, and FBI representatives where Mr. Vierling agreed

10   that he would make mandatory restitution.  And he has put

11   substantial money towards that within the last now four years.

12           THE COURT:  It is my finding, by a preponderance of

13   the evidence, that it has not been established that the

14   forensic accounting bill of $200,055.20 can be found to be

15   part of the mandatory restitution in this case.  It does, of

16   course, beg the question about civil liability maybe to Mr.

17   Vierling for the unlawful withholding of his 401(k) money or

18   by Mr. Vierling to the victim for other monies that they may

19   be able to prove by different burden of proof in an

20   appropriate court of law as to how much has been paid, but

21   under the criminal law statutes it's my finding that the

22   mandatory restitution as established by the U.S. Attorney's

23   office in this case is $292,323.69.

24           Of course, $175,000 of that is due to the bonding

25   company or the insurance companies, leaving -- so we'll have

1    to amend the chart in paragraph 80 because by my calculation,

2    and after the insurance companies are made whole, there is a

3    balance due the victim of $117,323.69.  I don't know if

4    anybody else has done the math, but that's what I've come up

5    with.

6            All right.  The next objection is to paragraph 89.

7            MR. BOXERMAN:  Yes, Your Honor.  That's the paragraph

8    that says that probation doesn't know of any reason for

9    variances.  If I think I have a variance, I object to that in

10   every case.  That's their standard language, and that's my

11   standard objection.

12           THE COURT:  Again, that's a recommendation -- that's

13   their observation.  I gather you have a different one.

14           MR. BOXERMAN:  Right.

15           THE COURT:  That doesn't mean they're wrong or that I

16   should change that paragraph, but obviously everyone gets a

17   right to explain to me under 18, United States Code, 3553(a)

18   as to what, you know, the appropriate sentence is under the

19   Supreme Court's guidance.

20           Now, obviously, the victim had filed a motion for me

21   to appoint a special master in this case.  I shouldn't ignore

22   that.  I didn't ignore that.  But there was nothing about this

23   embezzlement case that was any different than any other

24   embezzlement case.  And certainly the U.S. Attorney's office,

25   which has increased its white collar task force in the last

1    few years, with the assistance of the Internal Revenue

2    Service, the Treasury Department, the FBI, any number of law

3    enforcement agencies, the postal inspectors filled with

4    lawyers and accountants are more than capable of coming

5    forward with the ability to present any evidence the United

6    States of America wishes to present, and I am perfectly

7    capable of understanding that testimony and permitting Mr.

8    Vierling and the victim to put on any evidence to the

9    contrary, but here we are.  There's no reason to appoint or

10   was no reason at any time in this case to appoint a special

11   master.  This isn't any more complicated than any other

12   embezzlement case.

13           The only complication is apparently there were a

14   large number of people who were involved in illegal activity

15   within and without this company, and that's a prosecution

16   determination to be made by the United States Attorney's

17   office but doesn't affect my ability to understand basic

18   concepts of addition and subtraction, which in this case led

19   to embezzlement and it wasn't just mere subtraction.  So any

20   of those motions that are pending as to the need for a special

21   master in this case are obviously denied.

22           As a result, we have ruled on all of the objections

23   filed by Mr. Vierling.  Any objections to the factual

24   statements in the presentence report on behalf of the United

25   States Attorney?

18

1        MR. REAP:  No, Your Honor.

2        THE COURT:  The factual statements in the presentence

3   report as amended here, based upon the objections that have

4   been filed and ruled upon, are adopted as the findings of fact

5   in this proceeding.

6        The next step is to determine if the probation

7   officer -- are there any objections to the probation officer's

8   application of the sentencing guidelines to the facts of this

9   case on behalf of Mr. Vierling?

10        MR. BOXERMAN:  No, Your Honor.

11        THE COURT:  Any objections to the probation officer's

12   application of the sentencing guidelines to the facts of the

13   case on behalf of the United States Attorney?

14        MR. REAP:  No objection.

15        THE COURT:  Mr. Vierling, as you know, I'm sure

16   you've gone over this countless times with your counsel, you

17   have a total offense level of 18 and a criminal history

18   category of 1.  The guidelines would recommend a period of

19   incarceration of 27 to 33 months, supervised release of two to

20   three years, a fine of $6,000 to $60,000.  As we have

21   established today, there is mandatory restitution due in the

22   amount of $292,323.69, and there is a special assessment due

23   today in the amount of $100.

24        The next step is to determine if there are any

25   departure motions under the guidelines.  Are there any

1    departure motions on behalf of the United States Attorney?

2         MR. REAP:  Yes, Your Honor.  We did file such a

3    motion under seal.  Mr. Boxerman got a copy of that.  The

4    Court got a copy of that.  The victim did not.  And frankly,

5    we don't think the victim has the right to see that motion.

6         THE COURT:  Any departure motions on behalf of Mr.

7    Vierling?

8         MR. BOXERMAN:  No, we did not file any departure

9    motions.  There are some factors that we would argue for

10   variances that maybe could have been departure motions, but

11   we'll argue them as variance factors, Your Honor.

12        THE COURT:  All right.  And finally, Mr. Vierling, as

13   your attorney has alluded to, there is a statute, 18, United

14   States Code, 3553(a), that lists a number of factors I'm

15   required to consider before I can determine the appropriate

16   sentence in your case.

17        With that being said, save for allocution or

18   discussion of those sentencing factors, does either attorney

19   know of any reason why we should not proceed to the imposition

20   of sentence?

21        MR. REAP:  No, Your Honor.

22        MR. BOXERMAN:  No, Your Honor.

23        THE COURT:  I don't know where I picked it up.  I

24   don't know, maybe Mr. Harlan called my office, but I thought

25   at some point the victim wished to address the Court.

1  Probably better to do that before we get to allocution than

2  afterwards.

3          MR. HARLAN:  That's correct, Your Honor.

4          THE COURT:  Or a representative of the victim,

5  depending on how you define the word "victim" in this case.

6          MR. HARLAN:  Your Honor, this is Mr. Lester Hohl, who

7  is the chairman of CLP Corporation.

8          THE COURT:  Very good.

9          MR. HARLAN:  And one of the victims.

10          MR. HOHL:  As Dave said, my name is Lester Hohl.  I'm

11  the president of City Lighting Products, have been for the

12  last 37 years.  Mr. Vierling was our chief financial officer

13  from 1991 to 2007.

14          Our relationship goes back many years.  I played

15  basketball against his father when he was at South Side

16  Catholic High School and I was at St. Louis U. High.  We -- in

17  the early fifties, as a matter of fact, we grew up, our kids

18  grew up in the same parish, Our Lady of Providence, went to

19  the same school, and that's a reason I hired Mr. Vierling,

20  because of the relationship.  I hired him away from our public

21  accounting firm.  I remember watching him pitch at Affton High

22  School when he was 12 or 13 years old.

23          But it's been four years and 24 days since I last

24  laid eyes on you, and it was a harrowing day --

25          THE COURT:  You need to address me.  We don't address

1    other people in the courtroom, okay?  To keep it civil, you

2    talk to the Court.  You don't talk to individuals.

3          MR. SHORT:  All right.  It was a harrowing day, and

4    the consternation, grief, and suffering caused by Mr. Vierling

5    meant many sleepless nights for my family and all our

6    employees throughout this ordeal.

7          By his breach of trust, he fooled everyone.  He

8    fooled the whole family.  He fooled his co-workers at City

9    Lighting Products.  He fooled our vendors.  He fooled our

10   longtime corporate attorney, John McCartney, and he fooled our

11   banks where we had our line of credit.

12         Every day that he came to work was a lie.  He

13   misrepresented himself with a facade to his fellow co-workers,

14   seeking -- while seeking additional ways to steal.  He had our

15   total trust as a chief financial officer.  To this day, we

16   don't know how much he embezzled beyond the $493,000 that was

17   discovered by Brown Smith Wallace, the forensic accounting

18   firm.

19         City Lighting Products spent over $2 million to

20   defend his accounting negligence and fabricated accounting

21   principles which were presented to the federal government.

22   It's a tribute to our associate's employees and to our

23   customers that they have stayed with us throughout this

24   turmoil.  We were battered and bloody, but we're still

25   standing.

1          I hope that every day the rest of his life he

2    remembers these words:  That he betrayed me, he betrayed my

3    family, and he betrayed the co-workers and employees, the 80

4    people that worked for our company.

5          Thank you, Your Honor.

6          THE COURT:  Thank you, sir.  Allocution.  I take it,

7    Mr. Harlan, that was --

8          MR. HARLAN:  That was it, Your Honor.

9          THE COURT:  Thank you, sir.

10          Mr. Vierling, this is allocution.  You have the

11    opportunity to speak.  You can speak directly, you can ask

12    your attorney to speak for you, or you both may speak, however

13    you see fit, but if there's anything you would like to say

14    today, now is the time.

15          THE DEFENDANT:  Yes, sir.  First I want to say, Your

16    Honor, that I am truly sorry, ashamed, and remorseful for my

17    actions while working for this company.  And I also want to

18    apologize to my family for the stress and anxiety I've put

19    them through during this time.

20          When I went to see Mr. Capes and Mr. Boxerman over

21    four years ago, I came with the intent to clear my conscience,

22    to do the right thing, to tell the absolute truth, and then to

23    suffer -- take whatever consequences would come my way, and I

24    wanted to get out from the cloud of deceit and lies.

25          So I went and I made a confession, and I proceeded to

1    go to Mr. Boxerman and Mr. Capes, and I laid out the good, the

2    bad, and the ugly of my actions and the actions of the

3    company.

4          And it's been four long years, been the four longest

5    plus years of my life and my family's life.  I want to

6    apologize to my wife and my children, and I -- but I've never

7    regretted coming forward.  I've done the right thing, I've

8    told the absolute truth every step of the way, and I'm asking

9    for your mercy in that regard today, sir.  Thank you.

10          THE COURT:  Mr. Boxerman?

11          MR. BOXERMAN:  Your Honor, I filed a sentencing memo

12    in the case.  I know the Court has read it.  I know how

13    seriously this Court and all the judges of this court take

14    sentencing.  I don't think there's any purpose to be served in

15    me repeating what I put in the sentencing memo.

16          I'm standing before you on behalf of Mr. Vierling,

17    clearly and unambiguously asking for a sentence of probation

18    in this case.  There's a downward departure motion.  His

19    departure was extraordinary.  I think you can get to probation

20    based on that.  Five guilty pleas, wearing a wiring, hours and

21    hours meeting with the Government at their beck and call.

22          He -- Mr. Reap -- at one time said it would be a

23    gold-plated 5K, and I think that's what it is, not because

24    Mr. Reap wanted to make it gold plated, but his assistance was

25    gold plated in this case, and it should provide the basis for

1   a substantial departure downward and I would say a departure

2   downward to probation.

3          On top of that, we have the 3553 factors, and I set

4   them out in the sentencing memo.  I will just tick them off.

5   The fact that Mr. Vierling came forward to confess his own

6   conduct to the Government before there was any kind of

7   investigation.  The fact that he set aside the restitution

8   money before being charged.  The fact that he fixed his income

9   tax situation before the IRS coming forward and telling him to

10  do that.

11         The long period of time that this nature has -- that

12  this matter has gone on and the just unbelievable stress that

13  he's been under and his family's been under, and of course,

14  some of that is of his own doing.  I mean, when you commit the

15  acts he committed and then you confess them and face the

16  consequences, there's going to be a period of stress, but

17  these cases don't take four years while you wait to see what's

18  going to happen to you typically, but this one did.  I'm not

19  saying it's anyone's fault that this one did, but this one

20  did.

21         This is truly an extraordinary case in many ways, and

22  the sentence should reflect that.  There should be a sentence

23  of probation in this case, and we urge the Court in the

24  strongest terms possible to impose that sentence and place Mr.

25  Vierling on probation.  Thank you, Your Honor.

1        THE COURT:  Mr. Vierling, have you had the

2  opportunity, sir, to say everything you wanted to say?

3        THE DEFENDANT:  Yes, sir, Your Honor.

4        THE COURT:  Has your attorney spoken fully on your

5  behalf?

6        THE DEFENDANT:  Yes, sir.

7        THE COURT:  Anything on behalf of the United States

8  Attorney?

9        MR. REAP:  Judge, no.  I will reference Mr.

10  Boxerman's documents relating to variance and also my motion

11  that are both under seal.  I think they say it.  I guess I can

12  say I might have used that term "gold plated," but I will at

13  least say this.  This is not a cosmetic 5K.  There was some

14  truly, as the law demands, substantial assistance in this

15  case.  It led to five convictions and his own, and also some

16  substantial restitution that's going to go back to the victim

17  as he promised from day one, August 7 of '07 -- or not August

18  of '07.  I don't know the real specific date.

19        THE COURT:  The statute says that in fashioning an

20  appropriate sentence in any case, I need to consider the

21  nature and circumstances of the offense.  We heard it today,

22  and I'm sure Mr. Vierling understands and appreciates the term

23  "betrayal" and the abuse of trust that brought him to the

24  moment that he needed to confess.

25        Trust is one of those things we rely on, perhaps take

26

1   for granted, but when it's gone tarnishes everything.  The

2   history and characteristics of the defendant.  It's a hard

3   one.  Obviously, many good things and many bad things go into

4   bringing us to this moment.  There is the more defining moment

5   four years ago that recharted a path.

6          Reflect the seriousness of the offense.  Can't

7   underestimate or understate the seriousness of the offense.

8   Promote respect for the law.  I don't think that's been lost

9   here, and I suspect I will never see Mr. Vierling again,

10  hopefully no one else in the room.

11         Provide just punishment, afford deterrence.

12  Deterrence is both personal and societal as to the individual

13  and a message to others.  And protect the public from future

14  crimes.  I don't think that's a factor that has much effect on

15  any determination today.

16         The overriding consideration or the substantial

17  consideration is the fact that he provided substantial

18  assistance to the United States in prosecuting five other

19  individuals for their misconduct, conduct that may have never

20  come to light.  I don't know what would have come of this

21  civil audit by the IRS, but obviously any time kickback

22  schemes are exposed, they were designed to never be exposed,

23  and it takes a participant, or someone who is familiar with

24  the allegations, to ever put things right again.

25         And to provide substantial assistance in that regard

1    has to be -- well, certainly the United States benefits, the

2    people benefit when someone realizes the wrongfulness of their

3    conduct and is prepared to take the consequences but to

4    correct it.

5          As a result -- and unwarranted sentencing

6    disparities.  There are 5K1s and there are 5K1s.  Sometimes

7    people just tell on their friends, if you will, and they get a

8    5K1.  Other times they wear wires, they proactively get

9    involved with the United States and the FBI and others to do

10   the right thing.

11         In this case we have a more extraordinary 5K1, if you

12   will, than a, you know, just tell us what you know in a

13   one-hour proffer.  A lot more happened here than that.

14         As a result, it is my finding that a sentence of five

15   years' probation satisfies the statutory purposes of

16   sentencing, and sentence will be imposed as follows:  Pursuant

17   to the Sentencing Reform Act of 1984 and the provisions of 18,

18   United States Code, 3553(a), Stephen Vierling is hereby

19   committed -- placed on probation for a period of five years.

20         It's further ordered that pursuant to 18, United

21   States Code, 3663(a), you're to make restitution in the total

22   amount of $292,323.69.  $117,323.69 is due to City Lighting

23   Products.  $150,000 is due to Hartford Fire Insurance Company.

24   $25,000 is due to CNA Continental Casualty Company.

25         Now, I'm sure your attorney has talked to you about

28

1    this, but you are to make restitution to the clerk of the

2    court.  We'll transfer the money to the victims so there's no

3    dispute, confusion at a later time as to how much was paid and

4    to whom it was paid.

5           All criminal monetary penalties are due in full

6    immediately and are payable -- well, they're due and payable

7    in full within 30 days.  You are to pay the criminal monetary

8    penalties through the clerk of the court.  If you cannot pay

9    in full immediately -- I mean, what is the situation of

10   restitution?  Do I need to make a payment plan, or is it going

11   to be paid?

12          MR. BOXERMAN:  Well --

13          THE COURT:  There was suggestion here that a

14   substantial amount of it was ready to be --

15          MR. BOXERMAN:  $273,000 and some change is set aside.

16   If the Court ordered me to do it today, I could do it,

17   although it would probably be next week in the normal course

18   of the --

19          THE COURT:  No.  I gave you 30 days to make

20   restitution.

21          MR. BOXERMAN:  All right.  So that will leave just

22   under $20,000.  And we don't need a payment plan on that, Your

23   Honor.

24          THE COURT:  Okay.  Well, if it's not paid, obviously,

25   that comes out to -- over the five-year probation, it comes

29

1    out to $4,000 a year.  So let's say $400 a month beginning 30

2    days from today if it isn't paid in full.

3        Until all criminal monetary penalties are paid in

4    full, you are to notify the U.S. Attorney's office of any

5    material changes in your economic circumstances that might

6    affect your ability to pay.  You are to notify the U.S.

7    Attorney's office of any change in your mailing or residence

8    address that occurs while any portion of the money remains

9    unpaid.

10        Now, I'm not going to impose a fine, but I am going

11    to impose 200 hours of community service to be directed by the

12    probation office.

13        Now, while on probation you are to comply with the

14    standard conditions adopted by this court and with the

15    following additional conditions:  You are required to submit

16    your person, residence, office, or vehicle to a search by the

17    probation office based upon a reasonable suspicion of

18    contraband or evidence of a violation of any condition of your

19    release, and warn anyone else who resides with you -- and that

20    would include your computer -- warn anyone else who resides

21    with you they are subject to the search condition as well.

22        You should participate in a mental health treatment

23    program if directed to do so by the probation office and pay

24    for that based upon your ability to pay.

25        You are to provide the U.S. Attorney's office access

30

1   to any and all requested financial information.  You are

2   advised they may share that information with the probation

3   office.

4         You may not open any new credit charges or additional

5   lines of credit without the express written permission of the

6   probation office as long as any of the money remains unpaid.

7   If you receive any monies from tax refunds or any other

8   financial gains, you are to pay that money to the probation

9   office -- pay that money towards the restitution and notify

10  the probation office immediately if you receive any such

11  money.  You are, of course, to pay the restitution as ordered.

12        Based on your low risk for future substance abuse --

13  typically, I'm required to order substance abuse testing.

14  That's mandatory.  But I can suspend that if there's no

15  evidence of prior substance abuse, and I'm going to suspend

16  the mandatory statutory drug testing requirements.

17        It's further ordered that you are to pay to the

18  United States a special assessment in the amount of $100 which

19  is due today.

20        Are there any objections to the Court's findings of

21  fact, conclusions of law, or the manner in which the sentence

22  was pronounced?

23        MR. BOXERMAN:  None from us, Your Honor.

24        MR. REAP:  No, Your Honor.

25        THE COURT:  Sentence will be imposed as stated.

1           Mr. Vierling, if you want to appeal, you need to do

2    so within 14 days.  Your attorneys will file the notice for

3    you if you ask them to do so.  If for some reason you can't

4    get that done, you can ask the clerk of the court and he'll

5    file it.  If you cannot afford the filing fee, it is possible,

6    upon a proper motion, the fee would be waived.

7           Any other matters for the Court's consideration

8    today?

9           MR. BOXERMAN:  None from us, Your Honor.

10          MR. REAP:  No, Judge.

11          THE COURT:  All right.  Thank you.

12             **(PROCEEDINGS CONCLUDED AT 11:50 AM.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

    I, Shannon L. White, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

    I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

    I further certify that this transcript contains pages 1 through 32 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

    Dated at St. Louis, Missouri, this 12th day of December, 2011.


_____
/s/Shannon L. White
Shannon L. White, RMR, CRR, CCR, CSR
Official Court Reporter