David W. Harlan
314-342-4157 (Telephone)
314-613-8581 (Facsimile)
dharlan@armstrongteasdale.com

MISSOURI KANSAS ILLINOIS NEVADA SHANGHAI

August 18, 2011

Kimberly Sanders
Victim Witness Coordinator
Thomas F. Eagleton U.S. Courthouse
111 South 10ᵗʰ Street, Suite 2.325
St. Louis, MO 63102

    Re:  *United States v. Stephen E. Vierling*
        Case No. 2007R01097/Docket No. 4:11-cr-00238-RWS

Dear Ms. Sanders:

    Attached is the Confidential Victim Impact Statement of CLP Corporation (City Lighting Products) and its affiliates. Will you please acknowledge receipt and advise me when you submit this to the court prior to sentencing. Please file under seal.

    In addition, Mr. Lester Hohl, Chairman and CEO of CLP Corporation, would like to appear and speak briefly at sentencing of Mr. Vierling.

    Your assistance in facilitating this is appreciated. If you have any questions, please contact me.

    Yours very truly,

    ARMSTRONG TEASDALE LLP

    David W. Harlan

DWH:mah
Cc:  Lester Hohl
      Michael W. Reap
      Jean Kintz, USPO

**EXHIBIT B**

**VICTIM IMPACT STATEMENT**

Victim: Lester Hohl
Business: City Lighting Products Co.
USAO Number: 2007R01097
Court Docket Number: 11-CR-00238

Insert the impact of the crime here (or, if a separate victim impact form is attached, please use that form to describe the impact of the crime):

## See Confidential Attachment A.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | USAO No. 2007R01097 |
| | ) | Court Docket No. 4:11 CR238-RWS |
| STEPHEN E. VIERLING, | ) | |
| | ) | **FILE UNDER SEAL** |
| Defendant. | ) | |

PRELIMINARY VICTIM IMPACT STATEMENT
OF CLP CORPORATION AND ITS AFFILIATES

*Preliminary Statement*

*CLP Corporation and its Affiliates have made a request for additional victim impact information in the government's possession. After the government responds, CLP may amend or supplement this statement based on information provided by the government.*

Introduction

Stephen E. Vierling's criminal conduct has impacted CLP Corporation and its affiliates (CLP) in two ways.

First, employing a variety of sophisticated schemes over a period of 15 or more years, Vierling abused his position of trust by systematically stealing nearly $500,000 from CLP. CLP had to engage forensic accountants to uncover and document Vierling's dishonest activities. Concerning this impact, CLP has submitted a separate Victims' Financial Impact Statement to the US Attorney and the US Probation Office, which includes copies of the Forensic Audit Report of Brown Smith Wallace, CPA and supplemental materials. This Victim Statement focuses on the second impact, described below.

Second, when discovery of his crimes appeared likely, Vierling turned on his victims by falsely reporting CLP and members of the Hohl family to IRS criminal investigators for allegedly cheating on corporate income taxes.[1] He did this in order to aggrandize his status as an informant in the hope of mitigating the punishment he faced for his own crimes. To accomplish this, he

---

[1] Vierling was no different than many informants in that he presented the government with a brew of truth and lies. For example, he gave the government information about an over-billing scheme, involving less than $80,000 over a multi-year period, which resulted in the conviction of a CLP employee, Tim Hohl, and 3 employees of another company. He also gave information that led to the guilty plea of a former employee of a third company for defrauding his employer of a similar amount. Given the relatively small amounts of money these activities involved, when compared to his embezzlement, Vierling apparently felt the need to make more dramatic and unfounded tax fraud allegations in order to sufficiently impress the government with the value of his cooperation.

ATTACHMENT A

mischaracterized the tax implications of an accounting spreadsheet he had prepared and suppressed information about critical accounting documents.

Based on Vierling's accusations, the IRS, for 3 years, pursued a criminal tax investigation of CLP's corporate tax returns targeting Lester Hohl and Michael Hohl. The US Attorney and the Department of Justice Tax Division approved prosecution. Indictments were imminent. At the 11th hour, CLP's accountants unraveled Vierling's deception using his hand-written accounting records that he had not turned over to the IRS. Following receipt of the accounting analysis, the US Attorney declined prosecution of the tax case.

Vierling's false accusation, the ensuing IRS criminal tax investigation, and his various, sophisticated embezzlements, including his destruction or falsification of key records, caused CLP to incur business losses, legal defense costs, and accounting fees of several million dollars over and above the direct loss from his embezzlement. Moreover, key executives spent substantial time responding to the IRS investigation, rather than attending to the business of the company.

In sum, Vierling's dishonest dealings with CLP and the IRS almost broke the back of this family-owned company. He jeopardized the jobs of 80 or so employees who count on CLP for their livelihoods. He imposed a substantial emotional toll on Lester Hohl, Michael Hohl, their families, friends, and co-workers.

Good sentencing policy suggests rewarding defendants with more favorable sentences, who cooperate with the government to resolve other crimes. Conversely, good sentencing policy suggests penalizing defendants with hasher sentences, who fabricate information in pursuit of the benefits of cooperating with the government.

### The Parties

CLP, owned by the Hohl family, distributes commercial lighting products. It has branches in Kansas City, Denver and Pittsburgh.

Stephen Vierling was CLP's chief financial officer until October 4, 2007, when he resigned in the wake of an IRS/FBI raid at CLP's St. Louis office. He had become a government informant on or about August 16, 2007 and his information instigated the raid.

Lester Hohl, CEO of CLP, hired Vierling to supervise the accounting and financial functions of the company in January 1991.[2] Lester gave Vierling his position for two reasons. First, as an auditor with CLP's accounting firm, he was familiar with CLP's books and records. Second, he had a pre-existing personal relationship with Lester and Michael Hohl. Lester knew him as a youngster, because Vierling's family and the Hohl family were friends of long-standing. Vierling grew up in the same neighborhood with and attended the same high school as Michael, Lester Hohl's younger son, who is now a Vice President of CLP.

---

[2]Ironically, one of Vierling's first acts after joining the company was to discharge a bookkeeping clerk, while she was on maternity leave, because petty cash was missing. Vierling's embezzlements appear to have started at about this time.

10875081_1.DOC                                2

Case: 4:11-cr-00238-RWS   Doc. #: 30-2   Filed: 09/30/11   Page: 5 of 14 PageID #: 109

After employing Vierling, Lester Hohl became his benefactor. For example, Vierling's salary and bonus in the range of $150,000 to $200,000 was well in excess of the market rate for similar positions in St. Louis. For another example, in May 2007, Lester Hohl directed CLP to pay a one-time $12,000 health insurance premium to CLP's legacy health plan so that Vierling could have a hip replacement without the waiting period required by CLP's new health plan.

Vierling exercised total control over CLP's financial functions. He had sole control of the accounting system, the payroll function, the general ledger, the books of account, and the preparation of tax returns. His only assistant served as an accounts payable clerk.[3]

Vierling used his complete financial control to manipulate the accounts of the company to his advantage. As discussed in the Victims' Financial Impact Statement, over a multi-year period he embezzled nearly $500,000 by stealing from the employee savings plan, submitting fraudulent expense accounts, paying his personal credit card expenses from company accounts, and paying himself unauthorized salary and bonuses, among other schemes.

### A Routine IRS Audit Notice Panicked Vierling

In mid-July 2007, CLP received notice of a routine IRS audit of its Kansas City branch, scheduled for September 15, 2007.[4] Vierling had a vacation scheduled at the end of July, but was so concerned about the audit notice that he considered cancelling. Lester advised him to take his vacation and deal with the audit notice after his return.

Upon return from vacation in early-August, Vierling was upset and anxious. A co-worker described him as nervous and losing weight. Vierling prepared for the audit by setting up a separate work room. He spent a month or more essentially alone reviewing and assembling accounting records and other documents ostensibly in preparation for the audit.

In early August, 2007, apparently believing that the audit would result in discovery of his embezzlement, Vierling contacted an attorney in private practice, who arranged for Vierling to meet on August 16, 2007 with the IRS and the Acting US Attorney. Vierling gave the IRS and the FBI several items of information about CLP and members of the Hohl family, including the allegation they were cheating on corporate income taxes.

At this initial meeting (or shortly afterwards), he produced a spreadsheet, later marked as Government Exhibit 3("GX 3"), that he characterized as summarizing fictitious expense entries totaling approximately $2.77 million made in the books of CLP from 2002 through 2006.[5] He also turned over a box of records, stolen from the company, which purportedly corroborated his accusation of tax violations.

---

[3]Vierling resisted efforts, including requests by his accounts payable clerk, to increase the size of the accounting staff. He justified this by telling his clerk that she would not receive bonuses or would receive smaller bonuses if the accounting staff increased.

[4]In light of Vierling's cooperation, the IRS postponed the audit until October 31, 2007. CLP's offices were searched pursuant to warrant on October 4, 2007.

[5]GX 3, as falsely characterized by Vierling, would later prove to be a key link in the audit trail that unmasked Vierling's false accusations.

In the same meeting where he informed on CLP, Vierling confessed to embezzling approximately $400,000 from City Lighting.[6]

### Government Exhibit 3

| Fictitious Journal Entries By Company By Year | 2002 | 2003 | 2004 | 2005 | 2006 | Total |
|---|---|---|---|---|---|---|
| STL | 305,748 ✓ | 232,808 ✓ | (32,829) | 2,808 | (173,905) | $ 369,426 |
| KC | 93,225 ✓ | 150,050 ✓ | 537,782 ✓ | 388,744 ✓ | 301,032 | $1,471,783 |
| PGH | 195,528 ✓ | 299,403 ✓ | 332,400 ✓ | 40,000 | 115,050 | $ 833,726 |
| DEN | 69,811 ✓ | 63,353 ✓ | 66,700 ✓ | (18,824) | (202,000) | $ 2,340 |



*[handwritten]* Provided copies and discussed with Leo Hohl, Tim Hohl, & Mike Hohl 8/24/07 @ approx. 3:30 pm.

*[signature]* Vierling

---

[6] The Government only recently disclosed Vierling's admission of this amount. On other occasions, Vierling has admitted to embezzling lesser amounts. In a letter to CLP's insurance carrier, one of his personal attorneys admitted on his behalf that Vierling embezzled $305,000.  In his guilty plea he admitted to about $293,000.

### The IRS Search Warrant and Tax Investigation

On October 4, 2007, 25-30 IRS and FBI agents entered City Lighting offices in St. Louis with a search warrant based, at least in part, on Vierling's information. The agents seized the documents that Vierling had been marshalling in his work room since mid-August. In all the agents took 25-30 boxes of records and copied computer hard drives containing business information. The search and seizure operation shut down the business from approximately 8:45 a.m. until closing time.

For the next three years, City Lighting, Lester Hohl, and Michael Hohl lived under the cloud of a criminal income tax investigation. The IRS, relying on Vierling's statements and selective documents, recommended prosecution to the US Attorney. The US Attorney, in turn, sought approval for prosecution from the Justice Department, Tax Division. The Tax Division, after a conference with defense attorneys, instructed the US Attorney to proceed at its own discretion. On more than one occasion, the government attorney informed CLP that he was on the verge of presenting an indictment for tax fraud to the Grand Jury.

During the 36 months that the government had prosecution under consideration, CLP continued to investigate and analyze records in an effort to understand the basis for Vierling's puzzling accusations of criminal tax violations. The company enlisted the assistance of forensic accountants at Brown Smith Wallace and it's newly-retained outside accounting firm, Sabino & Co., to try and make some sense of the situation.

### The Implausibility of Vierling's Tax Cheating Allegations

From the inception of the investigation, Vierling's allegations of tax cheating did not make accounting sense to CLP. The reported cheating allegedly involved overstating of the "cost of goods sold." Cases of overstating cost of goods sold to reduce taxable income typically involve proprietorships or pass-thru entities where the owner realizes an immediate cash benefit from the reduction in tax liability. That was not the case for CLP.

CLP is a closely-held "C" corporation. The income of "C" corporations is taxed at the corporate level and any dividends are taxed again at the individual shareholder level. As a result of this double taxation, no owner of a closely-held "C" corporation, including the Hohl family, has a financial motive to participate in a tax evasion scheme of the kind Vierling described.

Virtually every closely held, owner-managed "C" corporation routinely minimizes corporate income taxes by employing lawful methods well-known in the business and accounting community. These methods, according to CLP's accounting experts, involve increasing salaries and bonuses paid to employee-shareholders, thereby creating a legitimate expense that reduces income. This minimizes corporate income taxes and avoids double taxation of corporate dividends. This legitimate tax-avoidance strategy is restricted only by IRS regulations prohibiting excess compensation. Every CPA recognizes this strategy.

Vierling, a CPA, had only to advise CLP that it could minimize corporate income taxes by increasing the salary and bonuses of the owner-shareholders and key employees of CLP. Given the revenues and existing levels of compensation, CLP could have easily increased executive compensation without concern for IRS regulations about excess compensation. This simple strategy

10875081_1.DOC                                                5

Case: 4:11-cr-00238-RWS   Doc. #: 30-2   Filed: 09/30/11  Page: 8 of 14 PageID #: 112

would have reduced corporate income taxes and put cash directly into the hands of Lester Hohl and the other shareholders. Falsely overstating the cost of goods sold, as Vierling alleged, increased expenses, but put no money in the hands of the shareholder-employees. Legitimately increasing salaries and bonuses would have done both.

The CLP companies did not declare dividends during the period of Vierling's allegations and have not declared dividends since that time. Other than declaring a dividend, the only way that an owner-shareholder of a "C" corporation can achieve any financial gain from the scheme described by Vierling is to monetize the unrealized gain from the tax evasion by selling the business. Yet Lester Hohl, the controlling shareholder, has never evidenced any intent to sell the business and has arranged his estate plan to that effect.

Moreover, GX 3 on its face did not appear consistent with a tax evasion scheme. If the journal entries reflected in GX 3 were really for the purpose of tax evasion, why was cost of goods sold *reduced* for certain locations in certain years? Moreover, if there was more than $2.7 million in unreported income, where did it go? The company did not distribute the money to shareholders. If not distributed, the unreported income had to be retained by the company and reflected on the balance sheet in some form.

Sabino & Co., a very reputable CPA firm, has compiled the financial statements of CLP since 2007. They have made no adjustments to CLP's balance sheets that would be expected and required if the company had understated income of $2.7 million.

These anomalies in Vierling's story persisted unanswered, until the truth came out in 2010. At the eleventh hour, when indictments were imminent, CLP's current Chief Financial Officer analyzed certain monthly accounting records in Vierling's handwriting that the IRS apparently did not know about from Vierling. These records were the start of an accounting trail that led to the unraveling of Vierling's accusations. Based on this initial analysis, Sabino & Co., analyzed entries on GX 3 and traced them to genuine, but inaccurate, entries made by Vierling in the monthly accounting records of the company.

### "Cracking the Code"

Every month for the years in question, Vierling hand-wrote a general ledger closing packet and received a physical inventory report. In the run-up to the IRS raid, Vierling did not turn these over to the IRS or set them aside for the IRS to seize. Nor did the IRS later subpoena or ask to see them.[7]

Acting on a hunch, John McCartney, CLP's new CFO, assembled and analyzed these general ledger closing packets and monthly physical inventory reports to see if they shed any light on Vierling's year-end journal entries summarized on GX 3. McCartney's examination revealed a

---

[7]The IRS apparently did not know of these documents or their relevance as the source records for the "fictitious" entries on GX 3. Had the IRS known of their relevance to that exhibit, which was the heart of Vierling's accusation, the agents would have seized the records at the outset or sought them through a grand jury subpoena. Vierling did not to disclose them (or, if disclosed, explain their relevance), because these records would have undercut the claim he was peddling to the IRS about GX 3 evidencing a tax fraud scheme.

number of perplexing monthly entries in the general ledger that were inconsistent with records of known accuracy prepared by others. In an effort to reconcile these anomalies, McCartney traced a sample of the monthly entries through the books to the general ledger and then to GX 3.

This sample analysis, based on company records prepared by or provided to Vierling each month, yielded a surprising explanation for the so-called "fictitious" entries on GX 3. Rather than being "fictitious" or "fraudulent," *the entries on GX 3 reflected correcting entries Vierling made at year-end to reconcile his incomplete or inaccurate monthly accounting practices.*

These preliminary findings strongly suggested that the only fiction associated with GX 3 was Vierling's claim that the entries on it evidenced a tax evasion scheme.

<u>Sabino & Co.'s General Ledger Analysis Refutes Vierling's Accusations</u>

Sabino & Co., the current outside accountants for CLP, conducted a full-scale study of CLP's general and subsidiary ledgers for the years 2002-2005 to confirm or refute the sample findings of John McCartney.[8] Their findings, summarized below, confirmed McCartney's findings. Appendix 1 presents the analysis in much greater technical detail.

A.    <u>Background</u>

The general ledger is the ledger containing all the accounts of a business. General ledger accounts are supported by subsidiary or detailed supporting ledgers which itemize the various components of a general ledger account balance. For example, the accounts payable (A/P) subsidiary ledger is a listing, by vendor, of all amounts owed (further broken down by invoice). Similarly, the perpetual inventory system lists all items of inventory with quantities, unit cost and extended values. The most basic of accounting controls dictate that the subsidiary ledgers should agree to the general ledger, and that periodic reconciliations of the two be performed. For companies the size of CLP, a monthly reconciliation represents good accounting practice.

B.    <u>Vierling Did Not Make Monthly Reconciliations of the General Ledger</u>

Vierling did not reconcile the inventory or accounts payable subsidiary ledgers to the general ledger except at the end of the year. Instead, as discussed in Appendix 1, he made monthly journal entries forcing the inventory general ledger balance to agree to the perpetual inventory system totals.

In double entry bookkeeping the other side of those monthly inventory entries was a corresponding entry to accounts payable. Since Vierling made these entries without analysis or reconciliation, they caused the general ledger balance for accounts payable to be out of balance with the A/P subsidiary ledger, thus necessitating large year-end adjustments, as summarized on GX 3.

Vierling's inadequate monthly accounting practices had the effect of *understating* accounts payable and, therefore, cost of goods sold. *See* Appendix 1. Rather than being "fictitious" or "fraudulent," the entries on GX 3 were Vierling's year-end attempt to adjust accounts payable and cost of goods sold to reflect the accurate balances in those accounts.

---

[8]CLP changed to a Windows-based accounting system in 2006.

Case: 4:11-cr-00238-RWS   Doc. #: 78-2   Filed: 10/28/13   Page: 10 of 14 PageID
Case: 4:11-cr-00238-RWS   Doc. #: 30-2   Filed: 09/30/11   Page: 10 of 14 PageID #: 114
#: 471

By tracing the entries in the detailed monthly accounting records to the adjusting entries on GX 3, the Sabino & Co., analysis shows, unquestionably, that Vierling made the year-end adjusting entries to correct for his consistent failure to reconcile inventory and accounts payable every month during the year as he should have done.

C.   Accounting Findings

The Sabino & Co., general ledger analysis found that the vast majority of the year-end adjusting journal entries to cost of goods sold, as summarized on GX 3, were required in order to correct inaccurate monthly entries and the accumulated total resulting from Vierling's inappropriate practice of: (i) making monthly journal entries to force the general ledger inventory to match monthly physical inventory without reconciling the differences, and (ii) making corresponding, unreconciled adjustments to accounts payable.

Vierling had to true-up the understatement of accounts payable and cost of goods sold accounts at the end of the year by making correcting entries. The remaining, small adjustments that made up the balance of the "fictitious entries" were normal year-end adjustments to accruals or other balance sheet accounts; some did not even affect the income statement but were just reclassifications on the balance sheet.

After Vierling reconciled the inventory accounts, the A/P accounts, the cost of goods sold, and performed other typical year-end account analysis and adjustments; CLP's financial statements and tax returns properly reflected the balance sheet and income of the Company.

These findings refute conclusively Vierling's assertion that he was overstating cost of goods sold as part of a tax evasion scheme – let alone that he was doing it at the instance of members of the Hohl family. The entries on GX 3 turn out to be neither overstatements nor "fictitious." They can be traced directly to various correcting entries that Vierling had to make in order to correct for the distortions resulting from his slovenly month to month accounting practices.

### The US Attorney Declines Any Tax Prosecution

CLP and its accountants cooperated fully with the IRS in its review of the detailed accounting analysis of Sabino & Co. CLP made available to the IRS the analysis and all supporting records, particularly those that Vierling did not disclose in his selective disclosures. Sabino & Co., met with the IRS special agents to explain their work.

On September 20, 2010, the US attorney notified CLP's attorney that the government was dropping its investigation of the income tax returns of CLP without prosecution of CLP, Lester Hohl, or Michael Hohl.

### Conclusion

Defending for three years these false accusations of tax cheating has left the CLP "family" financially and emotionally drained. The impact on them is magnified, because they considered Vierling a friend and trusted fellow-employee of long-standing. The impact is also magnified by their realization that they were twice victimized. First, Vierling stole from them. Second, he accused them falsely to minimize his punishment for the first crime.

10875081_1.DOC                                      8

The record leaves little room for doubt that Vierling mislead the IRS about CLP being a tax cheat. Or that his motive was to secure a cooperation letter from the government extolling his cooperation in a major tax fraud case in order to minimize his sentence for an embezzlement of nearly $500,000. In the end, Vierling was no more trustworthy as an informer than he was as a friend or financial manager.

In addition to the direct financial loss from Vierling's embezzlement, CLP asks the court to take into account in the sentencing of Vierling, the impact on CLP of the treacherous aspects of his conduct after going to the government and offering to inform on CLP.

Dated: August 18th, 2011

Respectfully submitted,

CLP Corporation

By: _Lester L. Hohl_
Lester Hohl,
Chairman & CEO

Armstrong Teasdale, LLP

By: _David W. Harlan_
David W. Harlan,
Attorneys for Lester Hohl

Lewis, Rice & Fingersh

By: _Barry A. Short_
Barry A. Short,
Attorneys for CLP Corporation

## Appendix 1

### Detailed Summary of the Sabino & Co., General Ledger Report

#### A.    Background and Summary

By way of background, the general ledger is the ledger containing all the accounts of a business.  General ledger accounts are supported by subsidiary or detailed supporting ledgers which itemize the various components of a general ledger account balance.  For example, the accounts payable (A/P) subsidiary ledger is a listing, by vendor, of all amounts owed (further broken down by invoice). Similarly, the perpetual inventory system lists all items of inventory with quantities, unit cost and extended values. The most basic of accounting controls dictate that the subsidiary ledgers should agree to the general ledger, and that periodic reconciliations of the two be performed. For companies the size of CLP, these reconciliations should be performed monthly.

Vierling did not reconcile the inventory or accounts payable subsidiary ledgers to the general ledger except at the end of the year. Instead, he made monthly journal entries forcing the inventory general ledger balance to agree to the perpetual inventory system totals. In double entry bookkeeping the other side of those monthly inventory entries was a corresponding entry to accounts payable. Since Vierling made these entries without analysis or reconciliation, they caused the general ledger balance for accounts payable to be out of balance with the A/P subsidiary ledger, thus necessitating large year-end adjustments, as summarized on GX 3.

Vierling asserted to the IRS that the year-end adjustments summarized on GX 3 were fictitious entries concocted to under-report taxable income. In truth, the detailed monthly accounting records[1] show the entries on GX 3 were unquestionably necessary year-end adjusting entries required by Vierling's consistent failure to reconcile inventory and accounts payable every month during the year as he should have done.

#### B.    The Details of the Analysis

The CLP companies are distributors of lighting products, primarily commercial light bulbs and fixtures. As such, CLP's balance sheet is reasonably straightforward, generally consisting of cash, accounts receivable from customers, inventory, accounts payable to vendors, a line of credit to a commercial lender and equity. The bulk of the alleged understatement of income arises from adjusting journal entries affecting the cost of goods sold, so the analysis began there.

---

[1] The monthly closing packets and physical inventory reports are accounting records that the IRS did not seize and never requested, presumably because Vierling never told the agents about their relevance. The inescapable conclusion is that Vierling deliberately withheld information about these records, because they undercut entirely the false proposition that he was peddling to the IRS about the existence of a tax evasion scheme.

1

The key to determining cost of goods sold is an accurate inventory record. Inventory at the beginning of the period, plus additions to inventory during the period (i.e. purchases), minus inventory at the end of the period equals cost of goods sold.

> BEGINNING INVENTORY
> + PURCHASES
> - ENDING INVENTORY
> = COST OF GOODS SOLD

When accounts payable are recorded for inventory purchases, the other affected account is purchases. In accordance with the formula shown above, an increase in accounts payable increases purchases and, when sales occur, increases cost of goods sold.

CLP's warehouse personnel maintain a perpetual inventory system. Incoming shipments are added to the accounts when received at the warehouse and outgoing shipments are deducted from the accounts when shipped to customers. On a periodic basis, usually twice annually, an actual physical count is taken of all inventory owned and the records are adjusted to reflect any differences. These differences are usually minor, reflecting price changes, breakage, or errors in receiving or shipping counts. The perpetual inventory records are independent of the general ledger accounting system. The inventory accounts in the general ledger are increased by an accounting clerk entering information from invoices received from a supplier for new inventory. Inventory accounts in the general ledger are decreased by an accounting clerk generating an invoice to a customer.

Because the inputs for these two systems are independent of one another (the perpetual system being maintained by warehouse personnel and adjusted by the physical movement of goods compared to the general ledger system being maintained by accounting personnel (Vierling) and adjusted based on sales and purchase documents), and because of the number of transactions in a month affecting inventory, discrepancies are to be expected. These discrepancies may arise from standard purchases and sales, drop shipments, debit memos, breakage, shortages or overages, rebates, cost adjustments, clerical errors, etc.

For this reason, the most important accounting control over this area of the business is a monthly reconciliation of the two inventory systems' totals. This reconciliation will identify all of the differences between the two systems. Without performing such reconciliation, it is impossible to determine (a) which system is accurate, or (b) which adjustments, if any, are required to correct the general ledger. This reconciliation is analogous to a person reconciling their bank account. If the person's check register and the bank statement are different it is impossible to know whether the net difference is due to bank errors or omissions, checkbook errors or omissions or simply timing differences due to outstanding checks or deposits-in-transit.

Vierling, who was responsible for this reconciliation, did not reconcile on a monthly basis differences between the perpetual inventory system and the general ledger. Instead, he presumed the perpetual inventory system to be correct and simply adjusted the number in the general ledger inventory account at the end of each month to match the perpetual inventory. In many cases these adjustments were significant in relation to the balance sheet, especially as a percentage of the inventory account balances.

2

Case: 4:11-cr-00238-RWS   Doc. #: 30-2   Filed 09/30/11   Page: 14 of 14 PageID #: 118

After making the adjustment to the inventory accounts, Vierling could adjust either accounts payable or cost of goods sold to keep the books in balance. If he adjusted cost of goods sold, the income would fluctuate by hundreds of thousands of dollars each month. The offsetting entry to accounts payable had no effect on income and management did not monitor accounts payable on a regular basis. Vierling chose to adjust accounts payable but he did not attempt to reconcile the accounts payable general ledger with the accounts payable trial balance until the year-end accounting.

Like inventory, the accounts payable system produces a detailed report that lists all of the Company's vendors and the amount owed to each of them, detailed by specific invoices. In theory, this A/P subsidiary ledger should always agree to the general ledger and the two systems should be reconciled every month. Because of the monthly general ledger journal entries Vierling made to "park" his unreconciled inventory adjustments, these two systems were also out of balance throughout the year.

At year-end, however, Vierling knew that the outside accounting firm (RubinBrown) would review the reconciliation of these two systems so he had to adjust the general ledger A/P balances to the subsidiary ledger A/P trial balance. He did this by adjusting cost of goods sold through the entries he now claims are "fictitious."

After Vierling reconciled the inventory accounts and the A/P accounts, and performed other typical year-end account analysis and adjustments, the companies' financial statements and tax returns would have properly reflected the balance sheet and income of the Company.

C.   Accounting Conclusions

The Sabino & Co., general ledger analysis, which is based on accounting records prepared by Vierling, refutes conclusively Vierling's assertion that he was overstating cost of goods sold as part of a tax evasion scheme – let alone that he was doing it at the instance of members of the Hohl family. The entries on GX 3 turn out to be neither overstatements nor "fictitious." They can be traced directly to various correcting entries that Vierling had to make in order to account for the distortions created by his slovenly month to month accounting practices.

In sum, the so-called "fictitious entries" are not fictitious entries at all. Instead, the vast majority of the year-end adjusting journal entries were necessitated by Mr. Vierling's practice of making monthly journal entries to force the general ledger inventory to match monthly physical inventory without reconciling the differences and then making corresponding, unreconciled adjustments to accounts payable that had to be fixed at the end of the year. The remaining, small adjustments that made up the balance of the "fictitious entries" were normal year-end adjustments to accruals or other balance sheet accounts; some did not even affect the income statement but were just reclassifications on the balance sheet.

3